[Cite as *State v. Petrone*, 2014-Ohio-3395.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. William B. Hoffman, P. J. |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J. |
| | Hon. John W. Wise, J. |
| -vs- | |
| | Case No. 2013 CA 00213 |
| ROBERT W. PETRONE | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common Pleas, Case No. 2010 CR 01481

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      August 4, 2014

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
PROSECUTING ATTORNEY
KATHLEEN O. TATARSKY
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio 44702-1413

For Defendant-Appellant

NICHOLAS SWYRYDENKO
137 South Main Street
Suite 206
Akron, Ohio 44308

*Wise, J.*

{¶1} Appellant Robert W. Petrone appeals from the October 3, 2013 and October 11, 2013, Judgment Entries of the Stark County Court of Common Pleas overruling his second and third motions for leave to file a motion for new trial on the basis of newly-discovered evidence.

{¶2} Appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶3} This case arose on September 19, 2010 when Appellant Robert Petrone shot Kevin Ciptak multiple times in the driveway of a tree farm in Jackson Township, Stark County, Ohio. The facts leading up to the shooting, as set forth in Appellant's two previous appeals to this Court, are as follows:

{¶4} Appellant and his wife, Sue Petrone, have been separated since 2006. Both attended high school with Kevin Ciptak. After the separation, Sue Petrone and Ciptak had an on-and-off dating relationship. Appellant and Sue Petrone have children together and although they live in separate households, they live on the same street in the same subdivision in Cuyahoga Falls, Ohio, about six houses away from each other.

*Testimony of Kevin Ciptak*

{¶5} On September 19, 2010, Ciptak went to Brubaker's Pub to watch the Cleveland Browns game that started at 1:00 p.m. Sue Petrone came to meet Ciptak late in the game and the two got into an argument. Sue Petrone left Brubaker's; Ciptak stayed briefly to pay his bill.

{¶6} Upon leaving the bar, Ciptak decided to drive by Sue Petrone's home to "smooth things over" after the argument. Sue Petrone was home but had her house

"buttoned up" to look as though no one was home. Ciptak drove by and continued on past Appellant's house.

{¶7} Appellant was outside, having come home early from the Browns game. Ciptak later said he waved at Appellant; Appellant said Ciptak "gave him the finger." Either way, shortly after Ciptak drove by, Appellant decided to follow him.

{¶8} Ciptak was traveling to a tree farm on Strausser Road in Jackson Township, Ohio. Once there, he planned to tag trees he needed later for a landscaping job. His route from Cuyahoga Falls took him south on Route 8. He first noticed Appellant following in his vehicle behind him in downtown Cuyahoga Falls. Ciptak proceeded south on Interstate 77, and Appellant followed. Ciptak exited at Arlington Road, with Appellant still behind him. Ciptak ignored Appellant, assuming at some point he would turn back. Ciptak came to a church parking lot on Arlington Road and pulled in, in an attempt to get Appellant "off his back." Appellant did not follow him into the lot, but instead proceeded straight on Arlington. Ciptak turned around in the rear of the church parking lot and exited.

{¶9} Ciptak saw Appellant waiting for him at the next intersection. Appellant again fell in behind Ciptak, following him from a distance of 5 to 8 car lengths south on Arlington Road. Ciptak drove to Strausser and turned right, pulling into the tree farm a short distance up the road. Appellant continued straight on Strausser and did not follow Ciptak into the driveway.

{¶10} Ciptak drove down the long, narrow lane of the tree farm, observing dense trees, a residence, and a barn. No one was around, and Ciptak didn't feel comfortable

getting out to tag trees as he had originally planned to do. When he reached the barn, he backed up and turned around to head back out of the driveway.

{¶11} He met Appellant in his vehicle coming down the driveway. The two trucks stopped, "head to head." Appellant's vehicle was about 6 to 8 feet away. Ciptak put his truck in park and got out, screaming, "What are you trying to do? What do you want?" Ciptak walked in front of Appellant's truck.

{¶12} Appellant's driver's door was open. Ciptak later testified he saw the door open and saw a gun pointed at him, but Appellant never said a word. Ciptak looked at the gun and heard a popping sound. He fell to the ground, and felt enormous pain.

*The Neighbor's Account*

{¶13} Donna Allen lives at 8821 Strausser Road NW, Massillon (Jackson Township), which is next door to Haines Tree Farm. Allen's property is separated from the tree farm by a wooden fence and a line of mature white pines. Her driveway is parallel to the tree farm driveway.

{¶14} On September 19, 2010, Allen was in a barn on her property, next to the line of white pines, grooming her horses. Allen heard a truck in the tree farm driveway, which was slightly unusual because it was Sunday. She heard someone yelling "What do you want, mother-fucker" several times. Immediately after that, as Allen described it, she heard five or six gunshots very quickly.

{¶15} Allen had stepped out of her barn to ask the unknown persons to keep it down because her kids were around, but when she heard the gunshots, she went back into the barn, gathered her kids, and directed her husband to call 911.

{¶16} Allen saw a white truck with a utility cap, later identified as Appellant's vehicle, quickly back out of the tree farm driveway. Her husband went to the tree farm to check out the scene and told her someone was hurt. Allen and her husband administered first aid to Ciptak, whom they found on the ground alive and conscious but seriously injured.

*The Aftermath of the Shooting*

{¶17} When first responders arrived, Ciptak was able to tell them he had been shot by Appellant. Ciptak was hospitalized for three weeks, having been shot in the hand, biceps, and stomach. He has lasting nerve damage to his hand and at the time of trial was still in occupational therapy.

{¶18} Appellant, meanwhile, fled the area immediately after the shooting. He stopped in Cuyahoga Falls and briefly made contact with his wife and daughter, alarming Sue Petrone when he told her "it's over." She was not yet aware Ciptak had been shot when Appellant gave her the combination to a safe before leaving in his truck. She found this unusual and feared Appellant was suicidal. Appellant subsequently traveled to Colorado and Texas before ultimately surrendering at the Jackson Township Police Department.

*The Forensic Evidence*

{¶19} Appellee called forensic scientist Michael Short of the Stark County Crime Lab as an expert witness at trial. The forensic evidence indicated Ciptak's clothing contained a number of bullet defects. His shirt contained three: one at the lower hem to the right of the center (bullet entrance); an L-shaped defect on lower left front of shirt to the left of center (bullet exit); and an elongated defect slightly below and to the left of the

second defect (bullet exit). Ciptak's shorts contained a bullet defect in the front, exhibiting the physical effects of a bullet exit: a linear defect with fibers protruding from the inside out, as though stretched by passage of the bullet.

{¶20} Short further testified over objection that Ciptak's wounds were consistent with the conclusions he drew from the clothing. Appellee's Exhibit 3A depicted the wound to Ciptak's abdominal region, an "elongated, irregular defect" typical of an exit wound. Appellee's Exhibit 3B depicted the wound to his hip/buttock region. Short testified this injury is a circular defect indicative of the circular defect in the back of the shirt.

*The Trial Testimony of Dr. Boutsicaris*

{¶21} Dr. Peter S. Boutsicaris is a trauma surgeon at Mercy Medical Center who treated Ciptak on September 19, 2010. Boutsicaris noted an open bleeding wound to the left lower abdomen spurting blood; a bleeding gunshot wound to the left upper arm; and a gunshot wound to the right hand. When Boutsicaris encountered Ciptak initially, the patient was "extremely critically ill" and was going into shock. He was brought into surgery immediately. Ciptak would otherwise have died of blood loss due to the active bleeding in his belly. Boutsicaris testified that multiple surgeons worked on Ciptak to get his injuries under control.

{¶22} Boutsicaris testified he is a trauma surgeon and, as such, his primary focus in treating a patient is doing what is necessary to save a life. He does, however, try to "guess" which way a bullet may have traveled inside the body for purposes of treatment to determine what may have been injured in the bullet's path. In this case, Ciptak sustained an injury to his right back side and left lower abdomen which he

attributed to the path of a single bullet.   At the time of treatment, entrance versus exit was not relevant to Boutsicaris' immediate lifesaving measures and thus his notes were not precise.  He emphasized that he is not trained in forensics.

{¶23} At trial, however, Boutsicaris testified on direct he had reviewed the x-rays again on the morning of trial, commenting that his notes were conflicting so he wanted to take another look.  He stated he reviewed Ciptak's CAT scan from September 20 and determined the bullet entered back to front, right to left, based upon several factors: bone fragments pushing inward toward the belly, two metal fragments in the middle of the belly, placement of the buttock wound higher than the belly wound, and the general positioning of the wounds consistent with the hand wounds.

{¶24} Boutsicaris repeatedly stated his conclusions were based upon supposition:

{¶25} "* * * *.

{¶26} "[Dr. Boutsicaris:]  So—and the other thing I paid attention to is on the CAT scan, it's like looking at a slice –a bunch of sliced bologna where you're looking at the body in slices going from top to bottom.

{¶27} "And the one wound, the pelvic wound, the one—or the upper buttock was up high, and the one on the belly was down low which means the bullet would go high to low.

{¶28} "Well, assuming two adults are involved in something and a person tends to shoot at waist level or higher, the natural tendency if a bullet's going to enter is if it's going to hit the buttock, it's going to go and it's like a downward pathway.  So you got

a bullet going downward unless the person was on the ground shooting upwards which doesn't make sense.

{¶29} "So the probabilities if two people are standing, bullet entering the buttock, going downward and the bullet and the fragments, everything points towards the entry being the pelvis on the right side and exiting the left abdomen.

{¶30} "[Prosecutor:] Okay. So, in other words, back to front?

{¶31} "[Dr. Boutsicaris:] Back to front.

{¶32} "[Prosecutor:] And right to left?

{¶33} "[Boutsicaris:] Right. And that goes along with the hand injuries, too.

{¶34} "[Prosecutor:] And that is in spite of the fact that the records refer to entry and exit both ways?

{¶35} "[Boutsicaris:] Yeah, I would say I was wrong in my initial impression because I—the guy comes in, I'm looking at the bleeding through the front and I'm not measuring the holes. And usually people get shot facing each other. So that's, you know, supposition.

{¶36} "[Prosecutor:] Okay. If you were to learn that a forensic expert had analyzed other evidence and come to the conclusion it was back to front—

{¶37} "[Defense Trial Counsel:] Objection, Your Honor.

{¶38} "The Court: Overruled.

{¶39} "[Prosecutor:] --would you have any reason to disagree with that I guess based on your analysis of the medical records?

{¶40} "[Dr. Boutsicaris:] I don't have an opinion on that because I've never really had to analyze forensic evidence in comparison to what I do in my

practice.  So I've no experience in that so I really can't say what I would say.  I would have to look at the report to see if it fit my medical opinion.

{¶41} * * *".

*Self-Defense claim by Appellant*

{¶42} Appellant testified on his own behalf at trial and presented a theory of self-defense.  He related an incident in 2008 in which Ciptak approached him at an outdoor public event, asked what his problem was, and said he (Ciptak) was a "big powerful man."  No physical confrontation occurred.

{¶43} Regarding the incident on September 19, 2010, Appellant said it began when Ciptak drove past his house and gave him the finger. Appellant decided he wanted to talk to Ciptak and admittedly followed him. Appellant claimed that when Ciptak pulled into the church parking lot, he did not intend to stalk him further but remained in the area because he, too, planned to check out a work site in the Jackson Township area.  He admitted, though, that he saw Ciptak pull into the tree farm driveway, and he pulled into the neighboring driveway, turned around, and then entered the tree farm driveway himself.

{¶44} Appellant claimed he came slowly down the driveway and saw Ciptak as he crested a small hill, coming at him.  Appellant said Ciptak "lunged" at him, catching him by surprise.  Appellant stopped.  Ciptak got out of his truck but Appellant remained inside his. Appellant said Ciptak cursed at him, screaming, crossed in front of his vehicle and came up on appellant's driver's side. Appellant said "Leave me and my family alone," but Ciptak came up to his door.  Appellant claimed he told Ciptak to back off, but Ciptak persisted and reached into Appellant's door, which was partly open.

Appellant testified he grabbed his pistol, calm but cautious, describing Ciptak as enraged.  Appellant testified that when Ciptak reached into the truck, he pulled the trigger, firing three shots without deliberation.

{¶45} Appellant further stated after the shots were fired, Ciptak was able to turn and run back to his vehicle.  Appellant thought he was going to grab a weapon, so Appellant backed out of the driveway and left.  He claimed to have no idea his shots struck Ciptak; he didn't intend to physically confront Ciptak and only fired the gun to scare him.  He did not call for help.

{¶46} Appellant described his flight after the shooting as a trip to "get his head clear." He said he turned his cell phone off because he didn't want to talk to anyone, and was unaware Ciptak had been wounded.  He had problems with his truck in Houston but did eventually turn himself in to the Jackson Township Police Department.

*Indictment, Conviction, Appeal, and Motion for Leave to File*
*Delayed Motion for New Trial*

{¶47} Appellant was charged by indictment with one count of attempted murder in violation of R.C. 2903.02(A)/2923.02(A), a felony of the first degree, with a firearm specification pursuant to R.C. 2941.145; and, one count of felonious assault by means of a deadly weapon or dangerous ordnance, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with a firearm specification pursuant to R.C. 2941.145.

{¶48} Appellant entered pleas of not guilty and the case proceeded to jury trial, whereupon Appellant was found not guilty of attempted murder with a firearm specification and guilty of felonious assault with a firearm specification.  The trial court sentenced Appellant to an aggregate prison term of eight years.

{¶49} Appellant appealed from the judgment entry of his conviction and sentence, raising five assignments of error. We affirmed the conviction in *State v. Petrone*, 5th District, Stark App No. 2011CA00067, 2012-Ohio-911, appeal not allowed, 132 Ohio St.3d 1463, 2012-Ohio-3054, 969 N.E.2d 1231.

*First Motion for Leave to File a Motion for New Trial*

{¶50} On February 17, 2012, Appellant filed an "Application for Leave to File Delayed Motion for New Trial (Hearing Requested)" on the grounds of newly-discovered evidence. As new evidence, Appellant cited "the analysis of the medical records of [victim] Mr. Ciptak and the opinion therefrom stated in the affidavit of Daniel J. Spitz, M.D., a Forensic Pathologist and Toxicologist, and the testimony that Dr. Spitz would offer based upon his review and analysis of the substantial medical evidence regarding …. [Ciptak's injuries]." Appellant asserted the evidence was discovered in the course of preparation for civil litigation. Appellant summarized the newly-obtained evidence thusly: "In his affidavit, Dr. Spitz concludes … that to a reasonable degree of medical/scientific certainty, the stomach-to-bullet wound received by Ciptak entered from the stomach and exited through the buttock, in diametric opposition to Dr. Boutsakaris's (*sic*) testimony at trial." *See* Application for Leave to File Delayed Motion for New Trial (Hearing Requested).

{¶51} Dr. Spitz's affidavit asserts it is based upon his review of exhibits from the underlying criminal case, including the photographs of Ciptak, Ciptak's medical records, his radiologic records, a "trial testimony summary," and portions of the trial testimony of Ciptak and Dr. Boutsicaris. The motion also includes an article from the JAMA, April 28,

1993, Vol. 269, No. 16, entitled "Clinicians' Forensic Interpretations of Fatal Gunshot Wounds Often Miss the Mark."

**{¶52}** The State responded with a motion in opposition and Appellant replied.

**{¶53}** On April 18, 2012, the trial court overruled Appellant's motion.

**{¶54}** Appellant appealed to this Court, which affirmed the decision of the trial court finding Appellant had not demonstrated why he could not have learned of Dr. Spitz's opinion, or the possible fallacies in the opinions of trauma surgeons, within the time limitations of Crim.R. 33, and that Appellant's proffered evidence did not warrant the granting of a new trial. See *State v. Petrone*, 5th Dist. Stark App. 2012-CA-00096, 2013-Ohio-1138. Appellant again sought a discretionary appeal to the Ohio Supreme Court, which was denied.

*Second Motion for Leave to file Motion for New Trial*

**{¶55}** On July 24, 2013, Appellant filed a pleading entitled "Renewed Motion for Leave to File a Motion for New Trial." In this pleading, Appellant requested that the trial court review his previously denied first application for leave to file a motion for new trial and further consider the testimony of Michael Short, a Stark County Crime Laboratory employee who testified at Appellant's trial. Appellant claimed that Short's testimony was undermined by Canton Repository newspaper articles that discussed Short's disciplinary hearings before the Canton Civil Service Commission.

**{¶56}** By Judgment entry filed October 3, 2013, the trial court denied the motion. In a four-page judgment entry, the trial court found that the newly discovered evidence,

i.e., Short's discipline for performance issues on other cases, would not have changed the outcome of the trial:

{¶57} "The State's evidence - aside from Short's testimony - called Petrone's self defense theory into question. Ciptak's clothing did not have gun-shot residue, an indication that he was not shot at close range. Petrone admitted he did not see any weapon on the victim. There was no indication that anything prevented Petrone from simply backing out of the driveway and driving away instead of using deadly force. And, the entire incident was precipitated by Petrone following the victim on the highway, and then on roads off the high way, for more than twenty minutes. Under these circumstances, evidence about Short's performance and credibility seems unlikely to result in a different outcome at a new trial." Judgment Entry, Oct. 3, 2013, at 3.

*Third Motion for Leave to file Motion for New Trial*

{¶58} On September 11, 2013, Appellant filed a Third Motion for Leave to file a Motion for New Trial. This time, Appellant's claim of "newly discovered evidence" was an alleged statement made by the state of Ohio during oral arguments before this Court in November, 2012, that the state knew two days before trial that Dr. Peter Boutsicaris, the victim's treating emergency room physician, would change his medical opinion about the entrance point of Ciptak's abdominal gunshot wound, one of the three bullets that entered Ciptak's body.

{¶59} On October 11, 2013, in a six-page Judgment Entry, the trial court denied Appellant's motion, rejecting Appellant's claim that the outcome of the trial would have been different:

{¶60} "The reality is that the self-defense claim was based primarily on Petrone's uncorroborated testimony that he saw the victim reaching into the vehicle.

Ciptak's clothing didn't have an indication of the close-range shooting that would be expected in a self-defense scenario. Petrone admitted that he did not see any weapon on the victim. The evidence suggested that Petrone pursued Ciptak's vehicle for several minutes, crossing into a county where neither reside. There was no indication that Petrone was unable to back out of the driveway where the shooting took place instead of using force.

"Under these circumstances, there are a plethora of reasons that a jury could have rejected Petrone's self-serving and uncorroborated claim of self-defense." Judgment Entry, Oct. 11, 2013, at 5-6.

{¶61} Appellant now appeals from the trial court's last two denials of his motions for leave to file a motion for new trial and raises the following Assignments of Error for review:

## ASSIGNMENTS OF ERROR

{¶62} "I. THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE OF CHRONIC PROFESSIONAL MALFEASANCE BY THE STATE'S EXPERT CRIMINOLOGIST MICHAEL SHORT.

{¶63} "II. THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN DENYING APPELLANT'S THIRD MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL, WHICH WAS BASED UPON NEWLY DISCOVERED EVIDENCE OF

APPARENT PROSECUTORIAL MISCONDUCT REGARDING THE SURPRISE REVERSAL OF OPINION OF APPELLANT'S EXPERT WITNESS DR. BOUTSICARIS.

{¶64} "III. THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN DENYING APPELLANT'S ALTERNATIVE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL AS GROUNDS FOR A NEW TRIAL."

I., II.

{¶65} Appellant argues the trial court erred in denying his second and third motions for leave to file a motion for new trial.  We disagree.

{¶66} Crim.R. 33 governs new trials.  A motion for a new trial made pursuant to Crim.R. 33 is addressed to the sound discretion of the trial court, and may not be reversed unless we find an abuse of discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990). An abuse of discretion implies that the trial court's judgment is arbitrary, unreasonable, or unconscionable. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987).

{¶67} Under Crim.R. 33(A)(6), a new trial may be granted when "new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial."  Subsection (B) of Crim.R. 33 states, in relevant part, as follows:

{¶68} "Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed

within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein."

**{¶69}** "[A] party is 'unavoidably prevented' from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (1984).

**{¶70}** In this case, Appellant argues newly-discovered evidence in the form of Dr. Short's credibility at trial based on subsequent newspaper articles and Dr. Boutsicaris' changed opinion.

**{¶71}** To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that "the new evidence (1) discloses a strong probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

**{¶72}** Crim.R. 33(B) provides that motions for new trial on account of newly-discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered or from the trial court's decision unless "it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely." Thus, an untimely motion for new trial based on newly discovered evidence must show, by clear and convincing

proof, that the defendant was "unavoidably prevented" from discovering the new evidence.  *State v. Fortson*, 8th Dist. No. 82545, 2003-Ohio-5387 at ¶ 10.

**{¶73}** Further, Appellant has not demonstrated how or why he was unavoidably prevented from the discovery of the "newly discovered" evidence within the time limitations of Crim.R. 33.

*Dr. Short*

**{¶74}** Appellant argues that a June, 2013, newspaper article which detailed that Dr. Short had been fired for professional malfeasance was "newly discovered evidence" which warranted the granting of a new trial.

**{¶75}** At trial, Dr. Short testified as to the ballistics testing of the firearm used by Appellant in the shooting.  Appellant has not produced any evidence that Dr. Short falsified any evidence or erred in his examination of the weapon or the clothing in this case. Instead, he again argues Dr. Short's conclusions as to the entrance/exit of the bullets.

**{¶76}** As in his first motion for leave to file a motion for new trial, Appellant's arguments to the trial court and upon appeal center upon whether the third bullet to strike Ciptak entered from the front (stomach region) or back (hip/buttock region). Appellant again argues this was the crucial issue for the jury's rejection of Appellant's self-defense argument.

**{¶77}** Based on the foregoing, we find Appellant's proffered evidence does not warrant the granting of a new trial.  We are required to review the issue of newly-discovered evidence from the record as a whole, and having done that, we disagree with Appellant that his discovery of Dr. Short's disciplinary action constitutes newly-

discovered evidence within the meaning of Crim.R. 33. It is at best merely evidence of impeachment or a contradiction of the State's forensic evidence but is not relevant to the jury's finding of guilt as to the crime of felonious assault.

*Dr. Boutsicaris*

{¶78} Appellant has not explained why it took him until now to raise a challenge to Dr. Boutsicaris' testimony. Dr. Bourtsicaris' was the victim's treating emergency room physician and was, in fact, originally subpoenaed as a defense witness. Upon learning that Dr. Boutsicaris had changed his initial opinion while preparing for his trial testimony, the State also issued its own subpoena and supplemented its discovery response to add Dr. Boutsicaris to the list of prosecution witnesses. Further, the defense did not challenge or raise any objections to Dr. Boutsicaris' testimony. More importantly, Appellant has known what Dr. Boutsicaris' testimony was since that day in trial, therefore it is not "newly discovered" and no justification has been presented for the untimeliness of only raising it now.

{¶79} As set forth in our previous Opinion, we disagree that the third-bullet issue was the pivotal issue in the case; the jury could easily have rejected Appellant's self-serving testimony about Ciptak reaching into the truck, and his theory of self-defense overall, on a number of bases. If we concede for the sake of argument that the forensic testimony was the linchpin of the case that Appellant maintains, we must agree with the trial court and find Appellant has failed to demonstrate by clear and convincing evidence that he had "no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence."

**{¶80}** Accordingly, the trial court's decision is neither unreasonable, arbitrary, nor unconscionable, and the trial court did not abuse its discretion in overruling Appellant's motion for leave to file a delayed motion for new trial.

**{¶81}** Appellant's First and Second Assignments of Error are overruled.

III.

**{¶82}** In his Third Assignment of Error, Appellant argues that he was denied the effective assistance of trial counsel.

**{¶83}** In the case at bar, Appellant had the opportunity to raise the issues of ineffective assistance of trial counsel on direct appeal, but he failed to do so. The doctrine of *res judicata* bars Appellant from raising this issue anew via an appeal from a denial of a motion for leave to file a motion for new trial. *See, State v. Foy,* 5th Dist. No. 2009–CA–00239, 2010–Ohio–2445, ¶ 8; *State v. Miller,* 5th Dist. No.2011–CA–00074, 2011–Ohio–3039. This argument is outside the scope of this appeal.

**{¶84}** Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment. *State v. Szefcyk,* 77 Ohio St.3d 93, 671 N.E.2d 233(1996), syllabus, *approving and following State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104(1967), paragraph nine of the syllabus. It is well settled that, "pursuant to *res judicata,* a defendant cannot raise an issue in a [petition] for post conviction relief if he or she could have raised the issue on direct appeal." *State v. Reynolds,* 79 Ohio St.3d 158, 161, 679 N.E.2d 1131(1997).

Accordingly, "[t]o survive preclusion by *res judicata,* a petitioner must produce new evidence that would render the judgment void or voidable and must also show that he could not have appealed the claim based upon information contained in the original record." *State v. Nemchik,* 9th Dist. Lorain No. 98CA007279, 2000 WL 254908 (Mar. 8, 2000); *see, also, State v. Ferko,* 9th Dist. Summit No. 20608, 2001 WL 1162835 (Oct. 3, 2001).

{¶85} Appellant's Third Assignment of Error is overruled.

{¶86} For the foregoing reasons, the judgment of the Court of Common Pleas, Stark County, Ohio, is affirmed.

By: Wise, J.

Hoffman, P. J., and

Gwin, J., concur.

JWW/d 0714